UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
EUGENE ROOS,                                        :

                        Plaintiff,                  :          06 Civ. 15284 (GWG)

        -v.-                                        :          **OPINION AND ORDER**

MICHAEL J. ASTRUE,                                  :
Commissioner of Social Security,
                                                    :
                        Defendant.
--------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Eugene Roos brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review

of the final decision of the Commissioner of Social Security denying his claim for Social

Security Disability ("SSD") benefits.  The parties have consented to this matter being determined

by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The Commissioner has

moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), and Roos has cross-

moved for judgment on the pleadings.  For the reasons stated below, the Commissioner's motion

is granted, and Roos's motion is denied.

I.  BACKGROUND

        A.  Roos's Claim for Benefits and Procedural History

        Roos filed an application for SSD benefits on August 14, 1997.  R. 138-140A.[1]  Roos

claimed that he had been unable to work beginning on November 9, 1996 until the time of his

application.  R. 138.  The application was denied on January 14, 1998, and was denied again

upon reconsideration on March 4, 1998.  R. 33-34, 41-44, 47-49.

────────────────────

        [1] "R." refers to the page numbers of the administrative record, which is attached to the
Commissioner's Answer, filed June 8, 2007 (Docket # 7).

Following the denial of his application, Roos requested a hearing before an Administrative Law Judge ("ALJ"). R. 50-51. On December 9, 1998, Roos appeared with counsel at a hearing before ALJ Neil A. Ross, who remanded the matter with the consent of counsel to develop the record about mental health issues raised for the first time at the hearing. R. 37-38, 1086-89. Upon remand, Roos's application was again denied, reconsideration was denied and the case was returned to the ALJ. R. 39-40, 54-70. A hearing was held on May 3, 2000, and on July 27, 2000, ALJ Ross issued a written decision finding that Roos was not disabled. R. 91-109. Roos requested a review of the hearing decision, and on June 19, 2003, the Appeals Council issued an order remanding the matter to the ALJ for further consideration. R. 71, 73-75, 112-15. Hearings were held before ALJ Dennis G. Katz on December 6, 2005 and February 24, 2006. R. 1029-55, 1056-85. On March 7, 2006, ALJ Katz issued a decision finding that Roos was not disabled at any time prior to the date he was last insured. R. 16-32. Roos requested review of this decision by the Appeals Council, R. 13-14, 1023-28, but the Appeals Council denied the request on November 2, 2006, R. 6-9.

Roos filed the instant action on December 19, 2006. See Complaint, filed Dec. 19, 2006 (Docket # 1). The Commissioner moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on September 7, 2007. See Notice of Motion, filed Sept. 7, 2007 (Docket # 11); Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, filed Sept. 7, 2007 (Docket # 12) ("Def. Mem."). Roos cross-moved for judgment on the pleadings. See Cross-Motion, filed Sept. 13, 2007 (Docket # 14); Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Sept. 13, 2007 (Docket # 15) ("Pl. Mem."). The Commissioner filed a reply memorandum on October 19, 2007. See Memorandum

of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Further Support of Defendant's Motion for Judgment on the Pleadings, filed Oct. 19, 2007 (Docket # 17).

     B.  <u>Evidence Presented at the Hearings</u>

        1.  <u>Roos's Testimony</u>

    a.  <u>May 2000 Hearing</u>.  During a hearing before ALJ Ross on May 3, 2000, Roos testified that he was born in Brooklyn on June 30, 1959.  R. 1093.  He completed high school and one year of college.  <u>Id.</u>  He worked as a New York City Police Officer from July 1981 through November 1996.  <u>Id.</u>

    Roos had a heart attack in November 1996 and was released from the Police Department six months later.  <u>Id.</u>  About six months after his heart attack, he began feeling chest pains again and was admitted to the hospital three times in one month.  R. 1095.  In April 1997 Roos began feeling lightheadedness followed by chest pain, nausea and weakness.  R. 1096.  In July 1997, he had a stent implantation procedure performed to fix a blockage in his heart.  R. 1095-96.

    Roos testified that he suffered from tension headaches that "never go[] away," R. 1096, and that he gets severe chest pains about three times a month, which subside about 10 to 15 minutes after he takes Nitroglycerine spray, R. 1098.  In response to a question about physical limitations relating to his disability, Roos testified that he could not sit or stand for periods of time because of lower back pain.  R. 1099-1100.  He also testified that he walks on a treadmill for about one-half mile at a time.  R. 1100-01.  Roos said his concentration was not "too bad," but that his memory was poor.  R. 1104.  Roos testified that the only reason he could not do a job like selling theater tickets – one in which he could sit or stand periodically – was that he did not like to be around large groups of people, but he also said that he might "fly off the handle" if he

was working with the public.  R. 1106-07.

b. December 2005 Hearing.  During a hearing before ALJ Katz on December 6, 2005, Roos testified that in June 1997, while recovering from his heart attack, he started experiencing psychological symptoms such as feeling panicky and weak.  R. 1059-61.  He also began feeling lightheaded and could not concentrate.  R. 1061.  The onset of these symptoms caused him to become depressed.  Id.  Roos acknowledged that his condition has improved, but he testified that he still gets chest pain and becomes short of breath from exertion like walking quickly.  R. 1065.  Roos began having trouble sleeping in June or July 1997.  R. 1066.  He said that he sleeps better with a "C-Pap machine," but he still has to take a nap three to four hours after waking up.  R. 1067.  Roos also complained of a constant headache.  Id.  He reported having difficulties with concentration and his short-term memory.  R. 1070-71.

Roos testified that he can perform activities of daily living, use the phone, use the computer for about an hour a day, and read the newspaper for a short period.  R. 1069-73.  In addition, Roos said he drives himself short distances but does not like to drive alone because he falls asleep.  R. 1070.  Roos testified that he could travel on an airplane on his own, and that he thinks he could use a bus or a taxi.  R. 1072-73.  He said that he had helped his daughter set up trains around the Christmas tree the previous day.  R. 1078.

Roos also testified that he socializes occasionally with friends, and that he gets along with people generally.  R. 1075.  However, Roos testified that he had problems with people in authority such as supervisors at work.  R. 1075-76.

Roos testified that he continues to feel very depressed during what he described as "crash[es]," which occur about three times a week and can last from 15 minutes to two hours.  R.

1080-81.  He said that staying awake is the main thing preventing him from working.  R. 1083.

He also said his lack of concentration hindered him from working.  Id.

### 2.  Vocational Evidence

Donald Silve appeared as a vocational expert at a hearing on February 24, 2006.  R.

1034-51 (duplicated at R. 1122-1139).  He testified that Roos's past employment as a police

officer was skilled and could require a heavy to very heavy physical demand.  R. 1035.  The ALJ

proposed a hypothetical person of Roos's age, education and work experience who could do

light exertion, perform basic tasks, could not do any aerobic activity and could only interact with

the public one-third of his time.  R. 1036-37.  Silve stated that there were numerous unskilled

jobs available in the national and local economies in which this person could work, including a

small products assembler, an electric sealing machine operator, a final assembler, a jewelry

preparer, a jewelry painter or a cleaner/housekeeper in a commercial establishment.  R. 1037-40,

1043.  These jobs generally involve minimal contact with a supervisor unless the employee is

doing something wrong.  R. 1042.  Silve could not identify any jobs in the national or regional

economy for a person who could not get along with a supervisor at all, R. 1043-44, and he

testified that a person who had to be absent from work three times a month or more would not be

employable, R. 1045.

### C.  Records Related to Roos's Medical Condition

We next summarize the written records relating to Roos's medical condition.

### 1.  Danbury Hospital

Roos was admitted to Danbury Hospital on November 9, 1996 complaining of oppressive

chest pain.  R. 248.  An eletrocardiogram that was performed upon admission showed an acute

myocardial infarction (commonly known as a heart attack), and an echocardiogram showed regional wall motion abnormality involving the anterior wall.  Id.  Roos was admitted to the coronary care unit and administered Heparin and Nitroglycerin through an IV.  Id.  A cardiac catheterization was performed, and it showed some disease in the mid-left artery descending and the right circumflex artery.  Id.  He was discharged in stable condition on November 15, 1996 under the care of Dr. Lawrence Fisher.  Id.

### 2. Dr. Cohen

Dr. Alan B. Cohen evaluated Roos on December 9, 1996.  R. 223-24.  Roos remained asymptomatic at low levels of activities subsequent to his discharge from Danbury Hospital.  R. 223.  Dr. Cohen recommended that Roos maintain a low level of activity and take a stress test in two to three weeks.  R. 224.

Roos took a thallium stress test on December 16, 1996, which showed a severe fixed anterior and apical wall defect with dilated left ventricle.  R. 222.  After an office visit on January 13, 1997, Dr. Cohen prescribed Zocor and advised Roos to enter a rehabilitation program and continue taking Lopressor and "ASA."  Id.  One that visit, Roos had complained of brief atypical chest pains less than 30 seconds in duration and stabbing arm pains.  Id.  At an office visit on February 10, 1997, Roos reported no recurrent symptoms at all and was waiting to enter an exercise program.  R. 218.  An echocardiogram revealed low normal overall systolic function with septal and apical hypokinesis only, and Dr. Cohen increased his dosage of Zocor. Id.

### 3. Dr. Decter

Roos reported upper chest pain lasting 20 to 30 minutes with palpitations at an office

visit on April 16, 1997. R. 216. The pain went away five to ten minutes after taking

Nitroglycerine, and Roos also reported increased shortness of breath when he exerted himself

that was relieved if he rested when walking. Id. Dr. Bruce Decter, who evaluated him on this

visit, noted that the EKG showed sinus rhythm and anterior septal wall myocardial infarction of

indeterminate age. Id. He recommended a stress test to evaluate the atypical chest pain. Id. On

April 18, 1997, Roos took a stress test, which Dr. Decter concluded showed evidence of

myocardial ischemia. R. 215.[2] In addition, on April 21, 1997, Dr. Decter concluded that a

myocardial perfusion imaging report was consistent with an anterior and apical wall myocardial

infarction with no evidence for exercise-induced myocardial ischemia. R. 214.

### 4. Dr. Roth and Good Samaritan Hospital

Dr. Richard Roth evaluated Roos on May 30, 1997 as part of the continued management

of his coronary artery disease. R. 197-99. Roos came to see Dr. Roth after feeling lightheaded.

R. 197. Roos said he had done well after being discharged from Danbury Hospital but had vague

chest discomfort unlike the previous chest discomfort. Id. Dr. Roth noted that an EKG revealed

a sinus rhythm with evidence of prior anterior wall infarction. R. 198. He diagnosed Roos with

coronary artery disease status post anteroapical infarct and hyperlipidemia[3] and decreased his

dosage of Toprol to address the lightheadedness. Id. On June 11, 1997, Roos complained of

continued chest pain on occasion not related to a change in medication or activity, and on June

---

[2] "Myocardial ischemia" refers to "inadequate circulation of blood to the myocardium, usually as a result of coronary artery disease." See Steadman's Medical Dictionary 924 (27th ed. 2000) ("Steadman's").

[3] "Hyperlipidemia" refers to "[e]levated levels of lipids in the blood plasma." Steadman's at 850.

7

23, 1997, Roos called Dr. Roth and complained of lightheadedness, nausea and chest pain. R. 211. Dr. Roth advised him to stop taking Zocor and to call to report any symptoms. Id.

Roos was admitted to Good Samaritan Hospital on July 5, 1997 with complaints of chest pain on his left side that was sharp in nature without radiation. R. 346. He was diagnosed with unstable angina with progression of symptoms over the past few weeks, and the angina continued despite increased doses of Lopressor and Acupril. R. 347. Catheterization showed moderate LV dysfunction with anterior and apical wall akinesis, 3 vessel disease with moderate lesions noted in the proximal left anterior descending artery of approximately 50-60% stenosis, a critical lesion of the mid-left circumflex of approximately 95% stenosis and multiple non-critical lesions in the right coronary artery of approximately 40-50% stenosis. R. 348. Thus, the discharging physician, Dr. L. Root, decided to transfer Roos to Columbia-Presbyterian Hospital Center for percutaneous transluminal coronary angioplasty ("PTCA") on the left circumflex artery. Id.[4] The PTCA and insertion of a coronary artery stent were performed on July 11, 2007 at Columbia-Presbyterian. R. 296.

On August 27, 1997, Dr. Roth noted that Roos was taken off Norvasc, and that his chest pain had returned one week ago. R. 205. Roos reported that he was depressed, had fits of crying, and was "afraid to be alone." Id. Dr. Roth diagnosed him with coronary artery disease status-post anterior myocardial infarction, depression and hyperlipidemia, and he prescribed Prozac. Id. In a letter dated September 16, 1997, Dr. Roth stated that Roos relies on his wife to drive him to appointments and care for him because of his lightheadedness, weakness, chest pain

---

[4] "PTCA" refers to "an operation for enlarging a narrowed vascular lumen by inflating and withdrawing through the stenotic region a balloon on the tip of an angiographic catheter." Steadman's at 84.

and nausea.  R. 807.  Roos had begun a cardiac rehabilitation program that met three times per week.  Id.

Roos complained again of chest pain without activity or exertion to Dr. Roth on December 17, 1997.  R. 882.  Dr. Roth diagnosed Roos with coronary artery disease status-post myocardial infarction and stenting, and gastroesophageal reflux disease.  Id.  In a letter dated January 6, 1998, Dr. Roth stated that, "[g]iven the patients premature coronary disease and persistent chest pain, I would consider the patient partially disabled."  R. 286.

On April 28, 1998, Dr. Roth noted that Roos had seen a psychiatrist who prescribed him Paxil.  R. 883.  At that time Roos complained of lightheadedness, headaches and occasional left arm pain.  Id.  A stress test evaluated by Dr. Root on July 13, 1998 was negative for ischemic symptoms of angina and borderline positive for ischemic EKG changes in the inferolateral distribution.  R. 849-50.  Dr. Root noted a blunted heart response to exercise and above-average functional capacity.  Id.

Dr. Roth saw Roos again on January 3, 2001 and noted he was taking Lipitor and Prevacid.  R. 82.  Dr. Roth diagnosed Roos with coronary artery disease, status post anterior wall infarct–November 1996; status post PTCA of the circumflex–July 1997; elevated lipids; and mild to moderate liver dysfunction.  Id.

Roos reported chest pain while climbing up stairs to Dr. Roth on December 8, 2003, but his diagnosis and medications did not change.  See R. 978.

### 5. Dr. Zucker

Dr. Albert Zucker, who had treated Roos on a monthly basis since May 11, 1997, completed a residual functional capacity evaluation form on September 3, 1997.  R. 232-36.  He

diagnosed Roos with coronary artery disease, hypocholesterolemia, anxiety and atypical chest pain syndrome. R. 232. He noted that Roos's symptoms included dizziness, weakness and occasional chest pain, and that Roos discontinued medications when he thought they contributed to his dizziness and weakness and was currently only taking aspirin. R. 232-33. Dr. Zucker also noted that Roos had anxiety and was preoccupied with his medications and their side effects. Id. An exercise test revealed peri-infarct ischemia and a decreased ejection fraction. R. 234. Dr. Zucker noted that Roos's physical activity was limited because of chest pain; that his ability to lift or carry was limited; that his ability to stand or walk was limited to two hours per day; that his ability to sit was limited to eight hours per day; and that his ability to push or pull was limited. R. 235. Dr. Zucker did not further elaborate. Id.

In a narrative dated April 7, 1998, Dr. Zucker noted that he was not sure what part of Roos's disability was due to his heart problems and what part was due to his "cardiac anxiety," but these conditions prevented Roos from being employable. R. 495-96. Dr. Zucker concluded that control of cardiac risk factors and psychotherapy might allow Roos to attain a higher level of functioning. R. 496. On October 7, 1998, Dr. Zucker completed a Cardiac Residual Functional Capacity Assessment in which he diagnosed Roos as status-post myocardial infarction and listed his symptoms as shortness of breath, fatigue, weakness and dizziness. R. 517. He noted that Roos had no clear anginal pain. Id. He also noted that emotional stress worsened his symptoms; that Roos had chronic anxiety since his heart attack, which extremely limited his activity; and that he should avoid all but low stress situations. R. 518. Dr. Zucker concluded that Roos was "mildly limited" by his heart condition and "severely limited" by his anxiety. R. 519.

6. Dr. Ferro

Dr. John A. Ferro evaluated Roos based on a referral from Dr. Zucker. R. 270-72. Roos complained of being "foggy," and said he becomes fatigued and nauseous when he exerts himself too much, such as when playing golf. R. 270. Roos also complained of anxiety in his chest and interrupted sleep patterns. Id. Dr. Ferro recommended an MRI and an EEG. R. 271. He also recommended an endocrine work-up because endocrine problems can cause a "foggy" sensation. Id. On a follow-up visit on November 20, 1997, Dr. Ferro noted that the results of the MRI were most likely of no significance, and that the EEG was borderline abnormal and should be followed up with another EEG. R. 284.

D. Records Related to Roos's Psychiatric Condition

We now summarize the written records relating to Roos's psychiatric condition.

1. Dr. Gordon

Dr. Paul L. Gordon first saw Roos on December 23, 1997 on a referral from Roos's therapist, Nora Szalavitz. R. 784. Roos reported becoming depressed in July 1997 because of a fear of being alone, and he reported waking up crying two nights previously afraid his wife would leave him. Id. Roos had been prescribed Prozac but had stopped taking it after one week because of the side effects. Id. Roos wanted to continue taking St. John's Wort, and Dr. Gordon prescribed Vistaril. Id. Dr. Gordon noted that Roos's affect and mood were down and anxious and diagnosed him with Anxiety Disorder Not Otherwise Specified ("NOS"), Depressive Disorder NOS and Rule Out Agoraphobia. R. 783. On January 20, 1998, Roos reported feeling anxious and down, and Dr. Gordon prescribed Zoloft and Buspar and stopped Vistaril. R. 782. On February 17, 1998, Roos reported feeling better but still anxious. Id.

11

In a letter dated March 17, 1998, Dr. Gordon indicated that Roos was diagnosed with Anxiety Disorder NOS and Depressive Disorder NOS, that he was prescribed Zoloft for depression and Buspar for anxiety, and that his prognosis was fair. R. 512. In a Mental Residual Functional Capacity Assessment also completed on March 17, Dr. Gordon noted that Roos was markedly limited in the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within and maintain a schedule; the ability to complete a workweek without interruption from psychologically-based symptoms; the ability to accept criticism from supervisors and to respond appropriately; the ability to respond appropriately to changes in the workplace; and the ability to travel to unfamiliar places or use public transportation. R. 513-15. He found Roos mildly limited or not limited at all in other areas. Id.

On April 14, 1998, Roos's mood was anxious, and Dr. Gordon discontinued Zoloft because of teeth-clenching and prescribed Paxil. R. 782. On May 12, 1998, Dr. Gordon noted that Roos had seen a doctor and gotten medication for headaches, but otherwise his mood was good, and he reported no side effects from the medication. R. 781. On September 1, 1998, Dr. Gordon noted that Roos was stable and doing better, that his mood was good, and that he did not have any side effects from the medication. Id. On January 8, 1999, Dr. Gordon noted that Roos had insomnia, was irritable and agitated at times, and that his mood was down. Id. He was prescribed Celexa. Id. On February 5, 1999, Roos reported that he had stress from dealing with his new house and had difficulty sleeping, but his mood was good. Id. Dr. Gordon prescribed Remeron to sleep. Id. Dr. Gordon reported on March 4 and June 2, 1999 that Roos's mood remained anxious, and he adjusted medications based on the side effects that Roos reported. R.

780. During all of his visits with Dr. Gordon, Roos was advised to continue therapy in addition to being prescribed various medications. R. 780-84.

Dr. Gordon completed a Mental Impairment Questionnaire on June 25, 1999, in which he indicated he saw Roos quarterly and listed Roos's symptoms as poor memory, appetite disturbance and weight gain, occasional sleep disturbance, anger, frequent tiredness, psychomotor agitation, difficulty thinking or concentrating at times, intrusive recollections of his heart attack, and hostility and irritability. R. 774-75. Dr. Gordon noted that Roos has been "good" since starting medication, was prescribed Wellbutrin, and that his prognosis was "good." R. 776. He stated that Roos's impairments and treatment would cause him to be absent from work two times per month. R. 777. He indicated that Roos had poor or no ability to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers; to respond to changes in a routine work setting; to deal with normal work stress; and to deal with the stress of semiskilled or skilled work. R. 777-78. He also indicated that Roos had a fair ability to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being unduly distracted; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to understand, remember and carry out detailed instructions; to interact appropriately with the general public; and to maintain socially appropriate behavior. Id. Dr. Gordon explained that Roos's limitations ranked as fair or poor were connected to problems with anger. R. 778. Roos had a good ability to function in all other listed areas. R. 777-78. Dr. Gordon assessed that Roos had moderate difficulty maintaining social functioning, and that episodes of deterioration or decompensation in a work setting that might cause him to withdraw from the situation or

experience an exacerbation of his symptoms would occur once or twice.  R. 779.  Dr. Gordon

gave Roos a GAF of 60.  R. 774.[5]  Dr. Gordon completed a Mental Residual Functional Capacity

Assessment on October 13, 1999 with substantially similar findings.  See R. 886-88.

Roos reported being depressed and anxious on March 15, 2001.  R. 79.  He reported

feeling in control and declined a prescription because he wanted to try herbal remedies first.  Id.

Roos was not in therapy, although Dr. Gordon recommended that he return to a therapist.  Id.

Roos said he would contact Dr. Gordon if he did not feel better after taking herbal medications.

Id.

### 2. Dr. Abbott

Dr. John Abbott began treating Roos on August 29, 2001.  R. 1016.  Roos reported

difficulty controlling his anger, difficulty sleeping, panic attacks, racing thoughts at night, a

depressed mood and irritability.  Id.  Dr. Abbott diagnosed Roos with major depressive disorder

and panic disorder, and assessed Roos as having a GAF of 50.  R. 1019.[6]  He described Roos's

treatment goal as reducing Roos's anger, depression and anxiety, and Dr. Abbott prescribed

Zoloft and Zyprexa.  R. 1020-21.

Roos continued to meet with Dr. Abbott on a monthly basis.  On November 5, 2001, he

---

[5] "GAF" stands for the Global Assessment of Functioning Scale in the DSM-IV.  See
Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000)
("DSM-IV-TR"), at 34.  The range of 51-60 on the GAF indicates:  "Moderate symptoms (e.g.,
flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id.
(boldface omitted).

[6] A GAF in the range of 41-50 indicates:  "Serious symptoms (e.g., suicidal ideation,
severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34
(boldface omitted).

reported feeling better and less anxious, although he said he had some minor angry outbursts. R. 1015. On December 4, 2001, Roos complained of feeling restless for two weeks, and on December 21, 2001, he reported feeling better, although his sleeping was erratic. R. 1014. Dr. Abbott increased his dosage of Zoloft. Id. On January 29, 2002, Roos was stable, and on February 26, 2002, he was also stable but complained of an increased startle reflex and tension. Id. On March 26, 2002, Roos felt better, and on April 26, 2002, he complained of increased anxiety and fatigue during the day. R. 1013. No significant changes were noted in later monthly reports except that Roos reported going to a sleep clinic. R. 1012-13. On October 29, 2002, he said he was using a C-Pap machine and was not sure if his sleep was improving, but he reported "feeling half way decent." R. 1012. On December 3, 2002, Roos was stable but reported that the C-Pap machine was not helpful, and on December 31, 2002, he was cheerful, feeling well and reported no side effects. R. 1011. Subsequent monthly reports indicated that Roos was stable and doing well. R. 1010-11. On May 6, 2003, Roos reported having a lapse in anger control, and on June 10, 2003, he complained that his headaches had been worse over the past few months. R. 1010. Roos's condition remained substantially similar in July and August 2003. Id.

Dr. Abbott completed a Psychiatric/Psychological Impairment Questionnaire on September 23, 2003. R. 964-71. He diagnosed Roos with Bipolar II Depression/Hypomania and Panic Disorder Without Agoraphobia. R. 964. He assessed Roos as having a GAF of 65 and listed his prognosis as fair with continued treatment. Id.[7] His clinical findings included

---

[7] A GAF in the range of 61 to 70 indicates: "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has

personality change, mood disturbance, emotional lability, recurrent panic attacks, difficulty thinking or concentrating, hypomania, generalized persistent anxiety, somatization unexplained by organic disturbance, hostility and irritability, and angry outbursts. R. 965. Dr. Abbott listed Roos's primary symptoms as depression, anxiety, anger, and sleep disturbance. R. 966. He listed his only medication as Zoloft. R. 971.

Dr. Abbott assessed Roos as markedly limited in the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. R. 969-70. He could not rate Roos on the ability to travel to unfamiliar places or use public transportation, R. 971, and Dr. Abbott assessed Roos as moderately limited or better on all other indicators, R. 969-71. Dr. Abbott explained that Roos "becomes inappropriately and excessively angry when those in authority do not take his criticism or suggestions seriously." R. 971.

Dr. Abbott noted that Roos is capable of tolerating low work stress, R. 967, and estimated that Roos would be absent from work more than three times per month due to his impairments or treatment, R. 968. He noted that his description of symptoms and limitations applied as of April 1997 at the earliest. Id.

In a report dated September 30, 2003 submitted to Roos's attorney, Dr. Abbott summarized Roos's condition. R. 972-74. Dr. Abbott stated that Roos had not suffered from

some meaningful interpersonal relationships." DSM-IV-TR at 34 (boldface omitted).

panic attacks since beginning treatment, though he still had generalized anxiety, his mood continued to fluctuate, and he continued to have numerous somatic complaints.  R. 973.  He responded best to treatment when taking Zyprexa and Zoloft, but Roos stopped taking Zyprexa on his own in October 2002 when he was feeling "half way decent."  Id.  Roos continued to complain of severe headaches and was seeking treatment for that and his sleep apnea.  R. 974.  Roos's mental status at the time of the narrative was "unchanged except for some deffervescence of anxiety and slightly improved mood."  Id.  Dr. Abbott concluded:

> Mr. Roos has been psychologically disabled since November 1996.  The onset of his depression and anxiety were precipitated by his myocardial infract [sic].  Although he has shown some improvement, his mental disorder is chronic and is expected to continue into the foreseeable future.  Progress for further improvement is guarded.
>
> Mr. Roos [sic] mental disorder renders him incapable of sustaing [sic] regular full time work.

R. 974.

Roos continued to see Dr. Abbott and similarly complained of headaches, fatigue and sleeping problems through February 2005.  R. 1006-09.  On June 13, 2005, Dr. Abbott completed a Psychiatric/Psychological Impairment Questionnaire with findings similar to those in the September 23, 2003 questionnaire.  See R. 989-96.  On February 22, 2005, Dr. Abbott reported that Roos was stable and exercising on the treadmill.  R. 1006.

### 3.  Nora Szalavitz, C.S.W.

Roos's therapist, Nora Szalavitz, completed a questionnaire about his condition on April 10, 1999.  R. 594-600.  She first saw Roos on August 28, 1997 and continued to see him every one to two months.  R. 594.  She listed his symptoms as hyperarousal, irritability and sleep disturbance, id., and she identified his treatment as psychotherapy to learn progressive relaxation

and dealing with depression and anxiety, R. 595.  She identified Roos as limited in his social interaction, R. 599, but she concluded that Roos was "able to do work-related mental activities in a setting where his obsessive thoughts are not aroused," R. 598.

E. <u>Consultative Examinations</u>

1. <u>Medical</u>

On January 14, 1998, a State disability review examiner reviewed the medical evidence and concluded that Roos could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand and/or walk for about six hours of an eight-hour shift with normal breaks, sit for a total of six hours of an eight-hour workday with normal breaks, and do unlimited pushing and pulling.  R. 288.  The examiner noted no other limitations.  <u>See</u> R. 287-94.  The assessment was reviewed and affirmed by an independent State agency medical consultant on January 15, 1998.  R. 294.

On May 13, 1999, a State agency review physician concluded that Roos could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand and/or walk for about six hours of an eight-hour workday with normal breaks, sit for a total of six hours of an eight-hour workday with normal breaks, and do unlimited pushing and pulling.  R. 753.  No other limitations were noted.  <u>See</u> R. 752-59.

2. <u>Psychiatric</u>

a. <u>Dr. Payne</u>.  Dr. Annette Payne conducted a psychiatric evaluation of Roos on April 28, 1999.  Roos recounted similar symptoms and history as described above.  <u>See</u> R. 747-49.  He informed Dr. Payne that he does some light cooking and cleaning in the house, manages his finances, and spends his time watching television, using the computer, exercising and taking care

of himself.  R. 748-49.  Dr. Payne concluded that Roos was capable of performing complex tasks independently, and that his anxiety and depression were "mildly to moderately limiting."  R. 749.  She diagnosed him with "[a]djustment disorder with mixed anxiety and depressed mood" and "[h]eart disease, heart attack," and she listed his prognosis as fair, indicating he might benefit from vocational counseling to determine what jobs he could do given his limitations.  Id.

     b. <u>Dr. Bruni</u>.  On May 11, 1999, Dr. Terri L. Bruni, a State agency psychological consultant, noted that Roos had no limitations in understanding and memory; that he had no limitations in sustaining concentration and persistence except that he was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and that he had no limitations in social interaction or adaptation.  R. 760-62.

     c. <u>Dr. Heller</u>.  Dr. Charles Heller conducted a psychiatric evaluation of Roos on June 23, 2005.  R. 1000-05.  Roos told Dr. Heller that he no longer had violent outbursts but had trouble sleeping at night.  R. 1001.  Roos reported improving slowly over the years but complained of sleeplessness and tiredness and worried about driving long distances because of those symptoms. Id.  Roos described mood swings every two to three days in which he felt depressed and irritable. R. 1002.  He completed serial sevens "flawlessly" and maintained concentration during the entire interview.  Id.  Roos reported mowing the lawn, doing laundry, dusting the house, shopping for clothing, taking care of his personal needs and hygiene, and using the computer. Id.  Roos responded to a question about why he cannot work by saying that he is exhausted and needs to lay down every day.  Id.  Dr. Heller diagnosed him with "Bipolar, most recent episode

mixed," anxiety disorder NOS, a pain disorder associated with a medical condition (back pain), heart attack, acid reflux, back pain, severe headaches and sleep problems. R. 1002-03. He assessed Roos as having a GAF of 58. R. 1003. In addition, Dr. Heller evaluated Roos's scores on the Wechsler Adult Intelligence Scale as indicating average intellectual functioning and the ability to learn and comprehend new material. R. 1005.

    F. <u>The 2006 ALJ Decision</u>

    On March 7, 2006, ALJ Katz issued a decision denying Roos disability benefits. R. 19-32. The ALJ concluded that Roos was not disabled at any time on or before December 31, 2002 – the last date on which Roos met the requirements for disability benefits. R. 20. He found that Roos had not engaged in any work activity from November 9, 1996 through the time of his decision. <u>Id.</u> The ALJ also found that Roos's impairments – his cardiac condition and depressive disorder – were "severe" impairments. R. 21.

    In reviewing the medical evidence and Roos's testimony, the ALJ concluded that, although Roos had minor cardiac symptoms following his heart attack, he did not suffer any symptoms resulting from his cardiac condition that prevented him from working after the stent placement. R. 23. Indeed, he was able to play a full round (18 holes) of golf during this period. R. 23 n.10. The ALJ found it significant that Dr. Root determined that Roos had "above average" physical capacity for someone his age, and that Roos testified that his "mental attitude," not physical problems, prevented him from working. <u>Id.</u>

    After reviewing the evidence of Roos's psychiatric impairments, the ALJ concluded that Dr. Gordon's findings that Roos's residual functional capacity was markedly limited in several areas should be given significant but not controlling weight because they conflicted with his own

notes.  R. 26.  According to the ALJ, the notes showed that Roos "was generally a 'high functioning' individual who required 'anger management' in social situations."  Id.

Similarly, after reviewing the evidence of Roos's treatment with Dr. Abbott, the ALJ found that Dr. Abbott's opinion that Roos was totally disabled was not supported by the doctor's notes or reports.  R. 27.  The ALJ found it significant that Dr. Abbott's narrative dated September 30, 2003 did not list symptoms more serious than periodic angry outbursts while Roos was self-medicating with herbal remedies; that the narrative did not indicate that the impairment of Roos's concentration was so extensive he could not perform basic work tasks; and that Roos himself testified that he was able to drive a car, use a computer for up to an hour at a time, travel independently, read the newspaper and understand television shows.  Id.  Despite Dr. Abbott's mention of problems with interpersonal relationships, the ALJ found this only related to one incident that occurred in May 2003, after the coverage period, while Roos testified that he had good relationships with his family, several friends, and people in general.  Id.  Furthermore, although Roos reported problems with authority figures, particularly supervisors, the ALJ noted that this symptom was not corroborated by any of Dr. Abbott's treatment notes.  R. 27-28.

The ALJ found that Roos could not perform his previous work as a police officer given his limitations.  R. 30.  However, based on the testimony of a vocational expert, the ALJ found that there were a significant number of jobs in the national and local economies that Roos could perform that required light exertion level work, were not overly complex, and did not require interaction with the public more than one-third of the workday.  R. 31.

Specifically, the ALJ's findings were as follows:

1.      The claimant has met the disability insured status requirements of the Act on November 9, 1996 – the date claimant stated he became unable to work – but

continued to meet them only through December 31, 2002.

2.     The claimant has not performed any substantial gainful [work] activity from November 9, 1996 through the date of this Decision.

3.     The claimant's cardiac and mental impairments are considered to be "severe" under the Act.

4.     The claimant's impairments do not meet or equal in severity the appropriate medical findings contained in 20 CFR Part 404, Appendix 1 to Subpart P (Listing of Impairments).

5.     The claimant can perform the full range of [unskilled] medium exertion level work that involves only occasional interaction with the general public.

6.     The claimant is unable to perform his past relevant work as a police officer.

7.     The claimant is classified as a younger individual with at least a high school education.

8.     The claimant does not have transferable skills to perform other work within his residual functional capacity.

9.     Based upon the claimant's residual functional capacity and vocational factors, there are jobs existing in significant numbers in the national and regional economies that he can perform, including but not limited to the jobs of cleaning person; assembly worker; preparer; and jewelry painter.

10.    The claimant has not been under a disability as defined by the Social Security Act and Regulations at any time from November 9, 1996 through December 31, 2002.

R. 31-32.  The opinion of the ALJ became final when the Appeals Council denied review on

November 2, 2006.  R. 6-9.

II.  APPLICABLE LEGAL PRINCIPLES

    A.  Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the

Commissioner has applied the correct legal standard and whether the decision is supported by

substantial evidence.  See, e.g., Acierno v. Barnhart, 475 F.3d 77, 81 (2d Cir.) (citing Pollard v.

Halter, 377 F.3d 183, 188 (2d Cir. 2004)), cert. denied, 127 S. Ct. 2981 (2007); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see generally 42 U.S.C.A. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even where substantial evidence supporting the claimant's position also exists. See generally Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.") (citation omitted). "The role of the reviewing court is therefore 'quite limited and substantial deference is to be afforded the Commissioner's decision.'" Hernandez v. Barnhart, 2007 WL 2710388, at * 7 (S.D.N.Y. Sept. 18, 2007) (quoting Burris v. Chater, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (describing the five-step process). First, in evaluating the claim, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpt. P, App. 1, or is equivalent to one of the listed impairments, the claimant must be found disabled. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment is not listed or is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past

relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all steps except the final one – that is, proving that there is other work the claimant can perform. Curry, 209 F.3d at 122 (citations omitted).

## III. DISCUSSION

Roos argues that the case should be remanded because the ALJ erred in finding that he was not per se disabled under Medical Listing 12.04; the ALJ did not properly follow the treating physician rule; the ALJ relied on flawed vocational expert testimony; and the ALJ failed to evaluate Roos's credibility as required by the regulations. See Pl. Mem. at 19-27. We address each of these arguments below.

### A. Per Se Disability Under Medical Listing 12.04

Roos objects to the ALJ's finding that he was not per se disabled, the third step of the process identified in 20 C.F.R. § 404.1520(a)(4)(iii). See Pl. Mem. at 19; R. 22. At this third step, if a claimant has an impairment that is equal to an impairment listed in Appendix 1, the claimant will be found disabled without a consideration of his age, education and work experience. See 20 C.F.R. § 1520(d).

Roos claims that the evidence establishes that he meets the conditions in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(A)(1) and § 12.04(B)(2)-(4). Pl. Mem. at 20. This regulation provides in relevant part:

Affective Disorders: Characterized by disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:
    1.  Depressive syndrome characterized by at least four of the following:
        a.  Anhedonia or pervasive loss of interest in almost all activities; or
        b.  Appetite disturbance with change in weight; or
        c.  Sleep disturbance; or
        d.  Psychomotor agitation or retardation; or
        e.  Decreased energy; or
        f.  Feelings of guilt or worthlessness; or
        g.  Difficulty concentrating or thinking; or
        h.  Thoughts of suicide; or
        i.  Hallucinations, delusions or paranoid thinking

*     *     *

B.  Resulting in at least two of the following:
    1.  Marked restriction of activities of daily living; or
    2.  Marked difficulties in maintaining social functioning; or
    3.  Marked difficulties in maintaining concentration, persistence, or pace; or
    4.  Repeated episodes of decompensation, each of extended duration . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  The ALJ found that Roos satisfied § 12.04(A)(1), but not § 12.04(B).  R. 28-29.  Roos argues that evidence from his treating doctors establishes that he met the criteria in § 12.04(B)(2)-(4), and that the ALJ did not provide sufficient rationale for crediting the opinions of the agency's consultants without considering Roos's treating psychiatrists.  Pl. Mem. at 19-20.

In fact, the ALJ did provide sufficient rationale for finding that Roos did not meet the criteria in § 12.04(B)(2)-(4), and he did not rely solely on the findings of the agency consultants in making this decision.  With respect to "[m]arked difficulties in maintaining social

functioning" under § 12.04(B)(2), the ALJ noted that Roos's own testimony established he was able to get along with people generally, family and friends, and he was able to go to the grocery store and get along with clerks there.  R. 29; see, e.g., R. 749 (good relationship with wife and close with family); R. 1075 (gets along with friends); R. 1076 (no problem getting along with people generally).  Although he noted that Roos does not "like" to be supervised, see R. 1076, the ALJ could properly find his social functioning under § 12.04(B)(2) to be only moderately limited, R. 29.

With respect to "[m]arked difficulties in maintaining concentration, persistence, or pace" under § 12.04(B)(3), the ALJ noted that Roos testified that he had routine memory problems, but the treating record established only "difficulty" with some concentration.  R. 29.  It was also significant that Roos reported that he used the computer for limited amounts of time, could read and understand the newspaper, and worked with his child to put trains around a Christmas tree. R. 29; see R. 1071, 1073, 1078.  The ALJ also noted that Roos was able to express himself and recall events that occurred years ago in hearings before two Administrative Law Judges, that health officials assessed his intelligence to be average, and that Roos appeared to have average intelligence to ALJ Katz.  R. 29.  Thus, the ALJ concluded that while Roos might have difficulty doing highly complex tasks, his concentration was mildly limited, and he could perform ordinary, basic mental tasks.  Id.

The remaining criterion at issue under § 12.04(B)(4) is "[r]epeated episodes of decompensation, each of extended duration."  Under § 12.00(C)(4), "[e]pisodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily

living, maintaining social relationships, or maintaining concentration, persistence, or pace." In addition, "repeated episodes of decompensation, each of extended duration . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(4). The ALJ noted that there was no evidence in the record of psychiatric hospitalizations. R. 29. He also noted that Roos was able to use public transportation and drive his car, and thus the record does not support the conclusion that he cannot function independently outside his home. Id.[8]

While Roos argues that the opinions of Dr. Gordon and Dr. Abbott "conclusively prove" that he satisfied the criteria in § 12.04(B)(2)-(4), Pl. Mem. at 20, the ALJ's opinion is supported by substantial evidence from the record. Furthermore, as explained in the next section, the ALJ properly declined to give controlling weight to the opinions of Dr. Gordon and Dr. Abbott. In addition, he "set forth sufficient rationale in support of his decision . . . not to find a listed impairment." Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982). Thus, the ALJ could properly conclude that Roos was not disabled within the meaning of § 12.04.

B. The Treating Physician Rule

Roos argues that the ALJ erred in failing to give controlling weight to the opinions of his treating medical doctors and psychiatrists. Pl. Mem. at 21-25. In determining whether a claimant is disabled, a treating physician's opinion is entitled to controlling weight if it is "well-

---

[8] Although Roos does not argue that he satisfied the requirement of 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(B)(1) of "[m]arked restriction of activities of daily living," see Pl. Mem. at 20, the ALJ found that Roos had not satisfied this requirement either, R. 28. Specifically, the ALJ reasoned that the record established the Roos could mow his lawn, clean his house, and care for his child, and no physicians noted any limitations in his activities of daily living. Id.

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). Under this rule, the Commissioner is not required to give deference to the treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). Moreover, "the less consistent that [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). "Genuine conflicts in the medical evidence are for the Commissioner to resolve." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

As one case notes,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. . . . Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)); accord Shaw, 221 F.3d at 134. The "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell, 177 F.3d at 133 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

### 1. Roos's Physical Impairment

With respect to Roos's heart condition, the ALJ found that Roos is capable of medium exertion level work, R. 22-23, even though one of his treating physicians, Dr. Zucker, indicated that Roos was limited to less than medium exertion level work, R. 235, and was not employable

as of April 7, 1998, R. 495-96. Roos correctly notes that the ALJ's opinion did not address Dr.

Zucker's assessment of Roos's limitations. Def. Mem. at 26-27. But "there is no requirement

that the ALJ 'mention[] every item of testimony presented to him' or 'explain[] why he

considered particular evidence unpersuasive or insufficient to lead him to a conclusion of

disability.'" Kim v. Barnhart, 2005 WL 1107048, at *7 (S.D.N.Y. May 10, 2005) (quoting

Mongeur, 722 F.2d at 1040); see also Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981)

("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are

unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical

testimony. . . .").

Because substantial evidence in the record supports the ALJ's finding that Roos was

capable of medium exertion level work, the ALJ did not violate the treating physician rule by

making a finding in conflict with Dr. Zucker's reports. Specifically, the ALJ noted that Roos

had experienced chest pain, dizziness and nausea as a result of this heart problems, but that Dr.

Roth found Roos only "partially disabled" on January 6, 1998. R. 22; see R. 286. In addition,

the ALJ noted that Dr. Root reported that Roos had "done well" since surgery and experienced

"only minimal anginal symptoms." R. 22; see R. 534. He also quoted Dr. Root's observation

that Roos has "above-average functional capacity for a man of his age." R. 22; see R. 535. The

ALJ found that, consistent with the medical record in general, the state agency consulting experts

found Roos capable of performing light exertion level work in January 1998 and medium

exertion level work in March 1999. R. 22; see R. 287-94, 752-59. The ALJ also found it

significant that Roos testified that it was his "mental attitude," rather than physical defects, that

prevented him from working. R. 23; see R. 1066. After noting that he considered the entire

medical record in the case in addition to Roos's demeanor while testifying, the ALJ found that Roos was capable of medium exertion level work.  R. 23.  In sum, there is substantial evidence in the record to support the ALJ's decision not to give Dr. Zucker's opinions controlling weight.

### 2. Roos's Mental Impairment

Roos argues that the ALJ's opinion that Roos is capable of performing unskilled jobs that require interaction with the public one-third of the workday or less, R. 29, is contrary to the opinions of Dr. Gordon and Dr. Abbott and violates the treating physician rule.  Pl. Mem. at 23-24.  Roos points out that Dr. Gordon found him markedly limited in many areas of mental functioning and argues that the ALJ misunderstood and mischaracterized Dr. Gordon's notes as reflecting a highly functioning individual.  Id. at 23; see R. 780-84.  Dr. Abbott found that Roos was not capable of sustaining regular full time work, R. 974, and Roos argues that the ALJ downplayed Dr. Abbott's findings and improperly credited the opinion of a "one-time examining psychologist," Dr. Heller, Pl. Mem. at 24.

In evaluating the evidence of Roos's mental impairment, the ALJ recognized that, after his heart attack, Roos "developed both depressive and anxious symptoms including irritability, fatigue, interrupted sleep patterns and decreased concentration."  R. 23.  The ALJ also noted that while Dr. Gordon assessed Roos as "markedly limited" in a number of functional areas in March 1998, R. 23-24; see R. 513-15, Dr. Gordon was unsure at that time whether the limitations would last longer than 12 months, R. 24; see R. 512.  Furthermore, the ALJ cited medical records indicating subsequent improvement, with no reference to marked limitations, thus suggesting that Dr. Gordon's opinion should be limited to the time it was written.  R. 24; see, e.g., R. 774 (GAF score of 60); R. 776 (improvement on medications).

The ALJ accepted the reports of Szalavitz (the therapist) only as the observations of a trained health professional, not medical opinions. R. 24. He noted that Szalavitz found Roos's symptoms less severe in an April 1999 report than Dr. Gordon did in 1998. R. 24; see R. 594-600. In addition, Szalavitz indicated that Roos could perform work-related activities in an environment that would not trigger his obsessive thoughts. R. 24; see R. 598. The ALJ noted that Szalavitz did not note any limitations in Roos's concentration, persistence, understanding, memory, or adaptation. R. 24; see R. 594-600. The ALJ also noted that Dr. Gordon himself relied on Szalavitz's observations in determining what medications he prescribed. R. 24. He concluded that Szalavitz's observations were consistent with consulting psychologist Dr. Payne. R. 24-25. The ALJ noted that, based on an April 28, 1999 evaluation, Dr. Payne concluded that Roos was capable of performing complex tasks independently, and that his depression and anxiety were "mildly to moderately" limiting. R. 25; see R. 749.

The ALJ also noted Dr. Bruni's review of the medical record as of May 11, 1999, in which Dr. Bruni found only minimal limitations in mental functioning. R. 25; see R. 760-62. Thus, the ALJ concluded that the difference between Dr. Bruni's opinion and Dr. Gordon's 1998 opinion "is attributed to 'medical improvement' resulting from Ms. Szalavitz' intervention and from the introduction of psychotropic medication which occurred between the dates those medical opinions were rendered." R. 25.

The ALJ noted that Roos's more intense symptoms, as indicated in the record, did not last more than 12 months and might have been caused by his cessation of prescribed medication to use herbal remedies. Id. He also noted that Dr. Gordon's notes from January 1998 through June 1999 do not indicate any deficits in mental functioning. Id.; see R. 780-82. Additionally,

Roos's therapist reported to Dr. Gordon on June 25, 1999 that she thought Roos could return to work, just not as a police officer or in another position that involved risk and stress.  R. 25; see R. 780.  Dr. Gordon gave Roos a GAF of 60 on June 25, 1999, which the ALJ noted suggested a highly functioning individual.  R. 25; see R. 774.  After making these and other observations about the record, the ALJ concluded that Dr. Gordon's opinion as to Roos's residual functional capacity could not be given controlling weight because it was not consistent with the medical record nor with Dr. Gordon's own notes.  R. 26.

The ALJ noted that before Roos began treatment with Dr. Abbott, he had treated himself with herbal remedies for over one year.  R. 26; see R. 973.  He also noted that Roos reported one instance of a lapse of anger in May 2003 and began to complain about severe headaches during that year.  R. 26; see R. 973-74.  In Dr. Abbott's September 2003 report, he does not report symptoms worse than periodic angry outbursts during the period Roos was taking herbal remedies; nor does he report that Roos's concentration was impaired to the extent that he could not perform basic work tasks.  R. 27; see R. 972-74.  Again, the ALJ referenced Roos's own testimony that he could drive, use a computer, read newspapers and understand television shows, and that he had good relationships with his family and could get along with people generally.  R. 27; see R. 1069-78.  The ALJ found no consistent corroboration in the record for Roos's assertion that he could not get along with supervisors, although he noted that there were references to difficulties in social functioning in the record.  R. 27-28.  He also noted that Dr. Abbott's conclusion in September 2003 that Roos had a GAF of 65 was not consistent with a finding that he was a totally dysfunctional individual.  R. 28; see R. 964.

In light of this evidence, the ALJ provided support for his decision not to give

controlling weight to the decisions of Roos's treating doctors. Because substantial evidence supports this conclusion, the ALJ did not violate the treating physician rule.

    C.  <u>The ALJ's Reliance on the Vocational Expert's Testimony</u>

If the assumptions that a vocational expert's opinion is based on are supported by substantial evidence, the expert's opinion may be properly considered as satisfying the Commissioner's burden of showing the existence of alternative substantial gainful employment given the claimant's capabilities. <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1554 (2d Cir. 1983). Roos argues that the ALJ erred in relying on flawed testimony by the vocational expert, Silve. Pl. Mem. at 25. Specifically, Roos objects to the hypothetical involving a person who could perform light work that required simple, not overly complex, tasks and did not require interaction with the public more than one-third of the workday. <u>Id.</u> Roos argues that the residual functional capacity indicated by the hypothetical is not supported by substantial evidence and is based on an improper application of the treating physician rule. Pl. Mem. at 25. As discussed above, this functional capacity is supported by substantial evidence in the record, and the ALJ specifically referenced that evidence in his opinion. Furthermore, as discussed in the previous section, the ALJ correctly applied the treating physician rule.

Roos also argues that the ALJ improperly relied on the vocational expert's testimony because the expert did not understand the Dictionary of Occupational Titles ("DOT"). Pl. Mem. at 26. Roos points to testimony where Silve said he was "at a loss" to describe how the DOT described the reasoning level of jobs he offered, <u>id.</u> (quoting R. 1134), and admitted that he did not know how the reasoning level would affect someone's ability to follow directions, <u>id.</u> (citing R. 1135). Thus, Roos argues that "the ALJ should have at least attempted to clarify the issue

before brazenly relying upon such unsound testimony." Id.  But the vocational expert made

clear in later testimony that the jobs he testified that Roos could perform had a reasoning level of

2, which means "using common sense to carry out instructions."  R. 1139; see Dictionary of

Occupational Titles, U.S. Department of Labor, Office of Administrative Law Judges, App. C

(4th ed. 1991), available at http://www.oalj.dol.gov/libdot.htm (defining 02 Level Reasoning

Development as: "Apply common sense understanding to carry out detailed but uninvolved

written or oral instructions.  Deal with problems involving a few concrete variables in or from

standardized situations.").  In fact, the ALJ, an attorney and Silve engaged in an extended

conversation on the record clarifying exactly this point.  See R. 1137-40.  The vocational

expert's description of the reasoning level necessary for the jobs he testified Roos could perform

is consistent with the ALJ's hypothetical of "work which is not overly complex" and "basic

simple type of tasks, not overly complicated."  R. 1124.  Thus, The ALJ properly relied on the

vocational expert's testimony.

        D.  Evaluation of Roos's Credibility

        Finally, Roos argues that the ALJ failed to properly evaluate his own credibility.  Pl.

Mem. at 26.  He points, inter alia, to Tornatore v. Barnhart, 2006 WL 3714649, at *5 (S.D.N.Y.

Dec. 12, 2006), which quotes a Social Security ruling:

>       In explaining the credibility assessment . . . the ALJ's opinion "must contain
>       specific reasons for the finding on credibility, supported by the evidence in the
>       case record, and must be sufficiently specific to make clear to the individual and
>       to any subsequent reviewers the weight the adjudicator gave to the individual's
>       statements and the reasons for that weight."

 Tornatore, 2006 WL 3714649, at *5 (quoting SSR 96-7p, 1996 WL 374186, at *4 (July 2,

1996)).  He argues that an ALJ must analyze a "lengthy list of factors" contained in that ruling,

Pl. Mem. at 26, and that the ALJ's decision must be reversed because he failed to do so here, id. at 27. In fact, the Social Security ruling does not require that there be a specific analysis of factors before making a credibility determination but only that "specific reasons" be given for the determination. SSR 96-7p, 1996 WL 374186, at *4.

      Roos does not state what "credibility" finding he objects to, however. Notably, the ALJ did not include an unsupported finding that Roos's testimony was not credible in general – a circumstance specifically barred by the ruling. See id. ("It is not sufficient to make a conclusory statement that . . . 'the allegations are (or are not) credible.'"). Rather, the ALJ pointed to a few specific instances in which Roos's testimony was not supported by medical records. See R. 27 (no corroboration of Roos's testimony that "he 'can't get along' with 'authority figures' or 'supervisors'" in treating notes); R. 29 ("The claimant testified that he routinely experiences memory problems, but this is not confirmed by the treating record, which mentions only 'difficulty' with some concentration."). In finding some of Roos's testimony not credible, the ALJ specifically addressed Roos's reported symptoms and discredited them with specific evidence from the record, employing relevant factors in his analysis. See R. 28 (noting that Dr. Abbott's assessment that Roos had a GAF of 65 "is not at all consistent with a totally dysfunctional individual"); R. 29 (noting that treatment record establishes only "'difficulty' with some concentration," and noting that Roos testified he could use the computer for limited periods of time, read and understand the newspaper, and help his child set up a train around the Christmas tree); see generally SSR 96-7p, 1996 WL 374186, at *3 (identifying as the kinds of evidence to consider in assessing the credibility of an individual's statements, for example, an individual's daily activities; the location, duration, frequency and intensity of the symptoms; and

factors that precipitate or aggravate the symptoms).  Certainly, the ALJ did not credit Roos's

testimony that he was "not able to perform any type of employment," R. 1095, inasmuch as he

found that Roos could "perform the full range of [unskilled] medium exertion level work that

involves only occasional interaction with the general public," R. 32 (bracketing in original).  But

Roos's testimony on this point was conclusory and did not relate to any specific factual matter.

As discussed in Section III.B above, the ALJ evaluated Roos's stated symptoms in light of the

entire record, and the ALJ discredited his assertion that he could not work because of his

symptoms.

   The ALJ thus properly evaluated the credibility of Roos's reports that he could not work

because of his symptoms by finding them inconsistent with the evidence in the record.

<u>Conclusion</u>

   The Court has considered all the arguments made in Roos's brief and found them to be

without merit.  The Commissioner's motion for judgment on the pleadings (Docket # 11) is

granted, and Roos's motion for judgment on the pleadings (Docket # 14) is denied.  The case is

dismissed.  The Clerk is requested to enter judgment.

SO ORDERED.

Dated: June 4, 2008
       New York, New York


                                         _____
                                         GABRIEL W. GORENSTEIN
                                         United States Magistrate Judge

Copies to:

Charles E. Binder
Binder and Binder, P.C.
215 Park Avenue South, 6th floor
New York, NY 10003

Leslie A. Ramirez-Fisher
Assistant United States Attorney
86 Chambers Street, 3rd floor
New York, NY 10007

factors that precipitate or aggravate the symptoms). Certainly, the ALJ did not credit Roos's testimony that he was "not able to perform any type of employment," R. 1095, inasmuch as he found that Roos could "perform the full range of [unskilled] medium exertion level work that involves only occasional interaction with the general public," R. 32 (bracketing in original). But Roos's testimony on this point was conclusory and did not relate to any specific factual matter. As discussed in Section III.B above, the ALJ evaluated Roos's stated symptoms in light of the entire record, and the ALJ discredited his assertion that he could not work because of his symptoms.

The ALJ thus properly evaluated the credibility of Roos's reports that he could not work because of his symptoms by finding them inconsistent with the evidence in the record.

Conclusion

The Court has considered all the arguments made in Roos's brief and found them to be without merit. The Commissioner's motion for judgment on the pleadings (Docket # 11) is granted, and Roos's motion for judgment on the pleadings (Docket # 14) is denied. The case is dismissed. The Clerk is requested to enter judgment.

SO ORDERED.

Dated: June 3, 2008
         New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge